## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**MARVIN A. HARLAN and**
**CAROL G. HARLAN**                                    **PLAINTIFFS/COUNTER-DEFENDANTS**

**V.**                                    **CASE NO. 5:14-CV-05287**

**THE BANK OF NEW YORK MELLON f/k/a**
**THE BANK OF NEW YORK, AS TRUSTEE**
**FOR THE CERTIFICATE HOLDERS CWALT,**
**INC., ALTERNATIVE LOAN TRUST**
**2006-30T1, MORTGAGE PASS-THROUGH**
**CERTIFICATES, SERIES 2006-30T1**          **DEFENDANT/COUNTER-PLAINTIFF**

## OPINION AND ORDER

Now pending before the Court are Plaintiffs/Counter-Defendants Marvin A. and Carol G. Harlan's Motion to Withdraw Freeze on USAA Account (Doc. 121). Defendant/Counter-Plaintiff The Bank of New York Mellon ("BONY")[1] filed a Response in Opposition (Doc. 125). The Motion is now ripe for decision.

The Court held a show cause hearing on June 28, 2016, concerning Mr. Harlan's second individual petition for bankruptcy, which he filed on June 27, 2016. The stated purposes of the hearing were: (1) to inquire of Mr. Harlan what his motivations were in filing a petition for bankruptcy on the eve of the scheduled foreclosure sale of his home,[2]

---

[1] BONY serves as the Trustee for the Certificate Holders CWALT, Inc., Alternative Loan Trust 2006-30T1, Mortgage Pass-Through Certificates, Series 2006-30T1.

[2] The home had been scheduled for foreclosure sale on two previous occasions, and both times, the sale had been halted due to the filing of individual bankruptcy petitions by either Mr. or Mrs. Harlan. The first petition, filed the day before the first scheduled foreclosure sale, was brought by Mr. Harlan. The second petition, filed the day before the second scheduled foreclosure sale, was brought by Mrs. Harlan. Filing a petition for bankruptcy ordinarily triggers an automatic stay of pending judicial proceedings. 11 U.S.C. § 362(a).

and (2) to consider whether Mr. Harlan filed this latest bankruptcy petition in bad faith, which could justify lifting the automatic bankruptcy stay and ordering the foreclosure sale to proceed as scheduled.

During the show cause hearing, Mr. Harlan represented himself *pro se*. He took the stand and testified that he opened a USAA account in early 2016 and initially transferred $200.00 or $250.00 to this account from his checking account at Arvest Bank. He also testified that an additional $50,000.00 was deposited to the USAA account as a result of an inheritance he received after his mother passed away. Mr. Harlan explained on the stand that this inheritance money was sitting in his USAA account and had not yet been spent, and that an additional $50,000.00 of inheritance money was expected to be deposited in the near future. Mr. Harlan also testified that he had placed $5,000.00 in income in this USAA account, and he had not spent it. The reason why Mr. Harlan testified so extensively about his bank account in the first place was to attempt to persuade the Court that he and his wife now had sufficient funds to pay their mortgage debt, and they should be allowed to attempt to refinance their mortgage and stop the foreclosure sale.[3]

Needless to say, the Court was troubled by Mr. Harlan's testimony. He stated under

---

The Court entered its Judgment and Decree of Foreclosure on September 2, 2015, and since then, BONY had been attempting to complete the judicial sale, but was stymied each time by the Harlans' bankruptcy filings—which they never pursued and which they filed solely for the purpose of halting the sale.

[3] This argument was a non-starter, however, as the Court explained in a previous Order (Doc. 126). The Harlans' mortgage and note ceased to exist on the day the Court entered its Judgment of foreclosure in September of 2015. It was therefore impossible for the Harlans to attempt to refinance their non-existent mortgage loan after that date, and the fact that the Harlans now had money in the bank to finally start paying their mortgage again—after two years of intentionally withholding all payments—was too little, too late.

oath that he had access to more than $55,000.00 in a bank account, yet he still chose to file for bankruptcy and was unable to give the Court any legitimate reason why he needed to restructure his assets.  He also made several confusing and contradictory statements concerning the funds available to him in his USAA account, and at some point during the hearing, the Court ordered from the bench that his USAA account be frozen and that he produce for review all monthly brokerage statements related to the account, beginning on the date the account was opened in 2016 until the date of the show cause hearing on June 28th.  The day after the hearing, Mr. Harlan emailed the Court a USAA brokerage account statement spanning a single month's time, from April 1, 2016, to April 30, 2016, and indicated that the total amount of money present in the account was not $55,000.00, but $200.00.

There were other troubling aspects of Mr. Harlan's testimony.  He stated on his June 27th bankruptcy application that he needed to pay his filing fee in installments because he was "unable to pay the filing fee at once."  (Doc. 2-2, Case No. 5:16-CV-05163).  This sworn statement regarding his inability to pay contradicted his sworn testimony during the show cause hearing that he had $55,000.00 in his USAA account.

The next troubling issue for the Court was the fact that Mr. Harlan checked a box on his bankruptcy petition affirming that he had received a briefing from an approved credit counseling agency within 180 days *prior* to filing his petition.  *See* Doc. 2-1, p. 5, Case No. 5:16-CV-05163.  During the show cause hearing, the Court ordered Mr. Harlan to produce the certificate confirming that briefing.  The day after the hearing, June 29, 2016, Mr. Harlan sent the Court an email claiming he could not find any proof that he had  completed the credit-counseling briefing prior to filing for bankruptcy, as he had previously sworn.  Mr.

3

Harlan apparently did not appreciate the gravity of the situation or the fact that he had been caught in a lie, as he simply emailed the Court a credit-counseling certificate he completed that same day, June 29, 2016, *two days after filing for bankruptcy*.

The Court held a second show cause hearing on July 1, 2016, in order to secure Mrs. Harlan's attendance and obtain her testimony on these matters, since at that point, the Court suspected that Mr. Harlan had perhaps committed bankruptcy fraud.[4] At the July 1st show cause hearing, both Mr. and Mrs. Harlan took the stand to testify about the bankruptcy petitions they had filed.  At the time of that hearing, Mr. Harlan had filed for individual bankruptcy twice since the Judgment of foreclosure had entered, and Mrs. Harlan had filed once.  All three of those petitions were similar in that they were filed on an "emergency basis" on the eve of a scheduled foreclosure sale, and they did not include any supplementary forms or schedules of assets and debts.  Mr. Harlan's first petition and Mrs. Harlan's only petition were dismissed by the bankruptcy court for failure to prosecute and to obey the orders of the court.  Mrs. Harlan's testimony at the show cause hearing also raised the Court's suspicion that she might not have prepared and/or signed her own bankruptcy petition and might not have listed the USAA account or other bank accounts in filings made before the bankruptcy court.  Judging by Mr. Harlan's testimony, it appears he might have committed perjury during the hearing on June 28th, in addition to committing bankruptcy fraud.

On July 27, 2016, the Court issued an Order finding that Mr. Harlan had not fully complied with the Court's previous order issued from the bench requiring him to produce

---

[4] The Harlans hired counsel after the first show cause hearing, and counsel was present with them at this second show cause hearing.

all of his monthly brokerage statements from his USAA account through the date of the first show cause hearing. *See* Doc. 120. The Court once again ordered Mr. Harlan to produce these statements and explained that he was not permitted to take any action with respect to his USAA assets, including any equities, bonds, or other assets held in his brokerage account, or to transfer any moneys into or out of his USAA account, without first requesting and receiving permission of the Court. This Order was to remain in effect until such time as the Court had the opportunity to review the entirety of his USAA-related document production, and/or until the Court received a proper motion to withdraw the freeze on these assets. *Id.*

Mr. Harlan has now submitted documents purporting to be the Harlans' USAA monthly statements from the date all USAA account(s) were opened through the end of June 2016.[5] On July 28, 2016, the Harlans, through their counsel, filed the instant Motion to Withdraw Freeze on USAA Account. In the Motion, the Harlans state that they have fully complied with the Court's prior Order and that the freeze on the account should be lifted.[6] A review of the bank statements reflects that no more than $200.00 had ever been present

---

[5] On or about August 15, 2016, the Harlans' attorney submitted—via email—the monthly USAA statements and other related information for *in camera* review. For purposes of making a clear record, these statements and other account receipt/disbursement information submitted by the Harlans will be received under seal as a supplemental exhibit(s) to the Court's Show Cause hearing conducted on July 1, 2016.

[6] The Court observes that it has no easy and/or meaningful method by which to establish the authenticity of the bank statements or the accuracy of the other information provided by the Harlans *in camera*. That said, it is relatively easy for the Court to conclude that either (1) these documents and information are not genuine and accurate, or (2) Mr. Harlan made blatantly false statements during the June 28th hearing with regard to at least two large financial transactions, both of which were contradicted by the USAA statements provided afterwards to the Court. Mr. Harlan's attempt to reconcile this contradiction during his July 1st testimony is confusing, nonsensical, and simply not credible.

in this account since it was first opened.  In an interesting twist, however, the Harlans admitted in their Motion that they had received a $115,000.00 deposit into their joint USAA brokerage account on July 7, 2016—coincidentally, the day after Mr. Harlan voluntarily dismissed his most recent bankruptcy petition that had been the subject of the two show cause hearings.  According to the Harlans, this significant deposit represented the promised "transfer of assets related to Mr. Harlan's mother's estate."  (Doc. 121, p. 2).

A couple of things are now clear to the Court.  First, from the USAA bank records provided by the Harlans, it appears Mr. Harlan did not receive $50,000.00 of inheritance money in his USAA account prior to the June 28th show hearing, nor did he ever place $5,000.00 of his and his wife's income in that account prior to the hearing.  Instead, he deposited only $200.00 in the account when he opened it, and he left the $200.00 there, unmolested, until July 7, 2016, about a week after the second show cause hearing and a day after Mr. Harlan asked the Court to dismiss his bankruptcy case.  Then, on July 7th, $115,000.00 suddenly appeared in the Harlans' USAA account.  Second, the USAA account statements indicate that the Harlans transferred $99,500.00 of the inheritance money to three sources: their Arvest checking account, a Roth IRA account, and their attorney's IOLTA account. Once their attorney—who entered his appearance after the June 28th show cause hearing—was made aware that the Court had frozen the USAA account pending further review, he directed the Harlans to return the inheritance money to the account.  They were able to return most of it, except for about $15,000.00, which the Court assumes they spent.

Turning now to the Motion to Withdraw Freeze, BONY argues in its Response that the freeze should remain in place because the Harlans owe BONY a judgment in the

6

amount of $713,254.33 and attorney's fees in the amount of $98,516.10.  The fact that the Harlans may be liable for a deficiency judgment to BONY does not provide sufficient legal justification for the Court to continue to freeze the Harlans' USAA account, particularly in light of the fact that the Harlans have seemingly complied with all Court Orders related to producing information on this account.  While  BONY may have the right to pursue further collection remedies against the Harlans—garnishment, for example—the mere availability of such collateral remedies offers no legal basis to justify the Court maintaining a freeze on the account proceeds. Therefore, the Harlans' Motion to Withdraw Freeze on USAA Account (Doc. 121) is **GRANTED**.

Nevertheless, the Court continues to be troubled as to the Harlans' testimony and filings in this case and in their bankruptcy cases.  The Court has considered whether to impose sanctions on Mr. Harlan, in particular, for making knowingly false statements in his bankruptcy petition and during his sworn testimony in the proceedings described above. In addition, the Court believes that Mr. and/or Mrs. Harlan may have committed bankruptcy fraud in one or more of their bankruptcy cases in this district.   Their testimony and submissions before this Court indicate that their bankruptcy filings are likely to have contained irregularities, misstatements, material omissions, and false statements. Therefore, the Court declines to issue sanctions at this time, and instead finds that the most appropriate way to address its many concerns is to refer the matter to the United States Attorney for the Western District of Arkansas for further investigation into whether Mr. and/or Mrs. Harlan committed bankruptcy fraud or any other crime.  **This referral is hereby made, by copy of this Order, pursuant to the criminal code at 18 U.S.C.**

7

**§ 3057(a)**, which provides that  "[a]ny judge . . . having reasonable grounds for believing that any violation under chapter 9 of this of this title or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed."

The Court will hold in abeyance the issue of sanctions, to include the possibility of criminal contempt sanctions, until the course of action that the U.S. Attorney may pursue has become more clear.

**IT IS SO ORDERED** on this _6th_ day of September, 2016.

_____

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE